**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

KRISTA WEAVER,

     *Plaintiff*,

*v.*                          CASE NO. 11-CV-10085

COMMISSIONER OF             DISTRICT JUDGE THOMAS L. LUDINGTON
SOCIAL SECURITY,           MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and Disability

_____

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Insurance Benefits ("DIB"), and for Supplemental Security Income ("SSI") benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 15, 17.)

Plaintiff was 44 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9 at 28, 32.) Plaintiff's employment history includes work as an office manager for seven years and as a press operator for four years. (Tr. at 125.) Plaintiff filed the instant claims on May 3, 2007, alleging that she became unable to work on September 25, 2001. (Tr. at 95, 102.) The claims were denied at the initial administrative stages. (Tr. at 48, 49.) In denying Plaintiff's claims, the Commissioner considered epilepsy (major or minor motor seizures) and anxiety-related disorders as possible bases for disability. (*Id.*) On December 15, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Thomas L. Walters, who considered the application for benefits *de novo*. (Tr. at 12-23.) In a decision dated January 8, 2010, the ALJ found that Plaintiff was not disabled. (Tr. at 23.) Plaintiff requested a review of this decision on February 3, 2010. (Tr. at 11.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on December 9, 2010, when, after the review of additional exhibits[2] (Tr. at 5, 93-94), the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On January 7, 2011, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

B.    **Standard of Review**

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d

at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record,

4

regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

### C.      Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the SSI program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D.    ALJ Findings**

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through December 31, 2006, and that Plaintiff had not engaged in substantial gainful activity since September 25, 2001, the alleged onset date. (Tr. at 17.) At step two, the ALJ found that Plaintiff's back and neck pain, affective disorder, history of seizures, and headaches were "severe" within the meaning of the second sequential step. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 17-18.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 21-22.) The ALJ also found that on the alleged disability onset date, Plaintiff was a younger individual – age 18 to 44. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 18-21.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 22-23.)

### E.      Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff has a history of seizures. The seizures began in 2001, but Plaintiff reported that she has not had one since 2006 and that "[t]]hey don't happen now [that she's] on medication for life." (Tr. at 158.)

An MRI of the lumbar spine taken on October 16, 1998, showed "no evidence of disc herniation" and "mild facet hypertrophy on the right L4/L5, L5/S1." (Tr. at 215.)

In October 2000, Plaintiff was the victim of an assault by a person who struck her from behind. Plaintiff sought treatment in the emergency room where staff initially believed she may have suffered a closed head injury. (Tr. at 190.) However, upon further examination, she was diagnosed with a facial contusion. (Tr. at 194.) A CT scan of Plaintiff's head taken at the time was normal. (Tr. at 196.)

7

Plaintiff participated in physical therapy for pain on the right side of her neck and back (myositis) in June 2001. (Tr. at 277-99.) As of June 22, 2001, Plaintiff reported that she felt "much better, it's like a miracle." (Tr. at 284.) Upon discharge, Plaintiff's strength was 5 or 5- out of 5 in all extremities. (Tr. at 277.)

In August 2001, Plaintiff was involuntarily admitted to the hospital when her mother filed a petition indicating that Plaintiff had threatened suicide. (Tr. at 307, 380.) Between August 7 and August 9, 2001, Plaintiff was treated in the hospital by Al-Saidi Nazar, M.D., for "adjustment reaction with brief depressive reaction," "unspecified alcohol dependence," and "tobacco use disorder." (Tr. at 301, 301-45.) After initial evaluation, Plaintiff was diagnosed with "adjustment disorder with depressed mood" and "alcohol dependence." (Tr. at 308, 383.) Upon discharge, the diagnosis remained the same, but Plaintiff was assessed with a GAF score of 70 and discharged "with no medication." (Tr. at 306, 381.)

On September 25, 2001, Plaintiff sought treatment in the emergency room after she had become warm, felt dizzy, had a "brief syncopal episode," and "struck her head on a table when she passed out" at work after having breathed glue fumes throughout the day. (Tr. at 217, 267, 271, 373.) In addition, a "coworker reported possible seizure type activity after fainting." (*Id.*) Plaintiff was examined (CT scan was normal), she was monitored for a period of time, and then she was discharged in stable condition. (*Id.*) After she left the hospital, she "had what her family described as a grand mal seizure," so she returned to the hospital the following day but refused treatment and left the hospital against medical advice. (Tr. at 218, 257.)

On October 3, 2001, Plaintiff was seen by J. Pauline Abbott, M.D., who stated:

> I discussed at length different causes for seizures with Krista. From her blood work I stated I could tell she was an alcoholic and she stated that she was. She also relates the day of the seizure she only had half a sandwich the whole day and had not eaten anything else. She related that alcoholism, hypoglycemia genetically and other

8

causes are often the reason for seizures, however I will continue working with her company to look into the chemical that was used as an adhesive to see if that could also contribute . . . . I gave her the number for Dr. Borders-Robinson . . . . At this time because of the blanking episodes and severe short term memory loss she will not be returned to work with machinery.

(Tr. at 360.)

On November 21, 2001, Plaintiff sought treatment in the emergency room because she had "blacked out." (Tr. at 245, 377.) A CT scan of Plaintiff's head was normal. She was given additional prescription medication and was discharged with a warning that she should not continue to drink approximately six beers per day while on the medication. (Tr. at 245-46, 249, 377-78, 399.)

On November 25, 2001, Plaintiff sought treatment in the emergency room for a seizure after she felt sick all day, was vomiting, and a "friend report[ed] that she became stiff and her eyes rolled back in her head" and she "was foaming at the mouth." (Tr. at 233, 375.) Plaintiff was examined and discharged with anticonvulsant medication. (Tr. at 234, 376.)

On November 28, 2001, Plaintiff was examined by Angala Borders-Robinson, D.O., specializing in neurology, who noted that Plaintiff had "been noncompliant with the Dilantin medication until just one week ago when she started taking it on a regular basis." (Tr. at 347.) In addition, Dr. Borders-Robinson indicated that at the time of her "most recent passing out episode," Plaintiff "had significantly elevated urine alcohol level at 309.9 with the range being from 0-10, so she was significantly intoxicated on that emergency room admission as well." (Tr. at 347.) Dr. Borders-Robinson added, "[w]hen I walked out of the room after examination with her mother, her mother stated that she drinks much more than what she admitted to," which was a "twelve pack per week." (Tr. at 347-48.) Plaintiff's neurological examination was normal, muscle strengths were 5 out of 5, and Dr. Borders-Robinson opined that Plaintiff "had several syncopal episodes" and

"[i]t is possible that these were seizures, but that is not clear to me at this time." (Tr. at 350.) Dr. Borders-Robinson recommended further studies and stated that Plaintiff could "return to work . . . with restrictions of not working in heights, not working over open pits, not working any type of moving machinery such as a forklift, until she has been free of these passing out episodes for a six-month period." (*Id.*) Dr. Borders-Robsinson further recommended that Plaintiff "continue her seizure medication until further recommendations are made." (*Id.*)

An EEG performed on February 14, 2002, was "a normal 24-hour ambulatory EEG." (Tr. at 351.) On June 24, 2002, a CT scan of Plaintiff's head was normal. (Tr. at 184.)

Two years later, on June 2, 2004, Plaintiff sought treatment in the emergency room for a "new onset this morning of some visual hallucinations." (Tr. at 548.) Plaintiff reported that she could "see the sense of cobwebs and bugs crawling through the air." (*Id.*) It was noted that she had "no auditory hallucinations" and that "[n]obody [was] telling her to do anything," nor was she suicidal, homicidal or a danger to herself or others. (*Id.*) The assessment concluded that her "[h]allucinations [were] possibly brought on by decreased alcohol consumption in someone who is used to consuming regular large amounts of alcohol." (*Id.*) Plaintiff was prescribed Ativan and was discharged home. (*Id.*)

As of November 29, 2004, Plaintiff's physician, Jill Larkin, M.D., noted that Plaintiff had "no alcohol x 6 months" and "no seizures x 2 years." (Tr. at 471.) Plaintiff was treated with prescription medications for anxiety and depression. (Tr. at 487, 489.)

Plaintiff underwent cervical dysplasia colposcopy in February 2006 based on findings of squamous cell carcinoma. (Tr. at 370, 391, 519, 546.)

An MRI of the lumbar spine taken on May 9, 2007, was normal. (Tr. at 537.)

10

On July 12, 2007, a disability determination case analysis stated that, with regard to Plaintiff's Title II claim, there was "determined to be insufficient evidence prior to DLI [date last insured]" because "[m]edical information in file for the time period of AOD [alleged onset date] to DLI is not sufficient enough to make a determination of the severity of the physical limitations . . . [,] claimant has had no seizures for 2 years," and "MER [medical evidence of record] from pre DLI does not discuss ongoing treatment of headaches." (Tr. at 565.) The Title XVI claim was "determined to be non-severe" based on "no ongoing treatment of headaches and no current seizure activity." (*Id.*)

On July 27, 2007, Plaintiff was examined by Disability Determination Services ("DDS") psychologist L. J. McCulloch, who diagnosed "Cognitive Disorder NOS appearing secondary to cumulative affects of blows to her head and reported seizures against background of alcoholic ethanol consumption," "Panic Disorder with Partial Agoraphobia," "Personality Change with irritability and psychotic feature of auditory hallucination," "Alcohol Dependency full sustained remission alleged four years," and "Nicotine Dependency." (Tr. at 560.) Plaintiff was also assessed with a GAF score of 50 and a "guarded" prognosis. (*Id.*) In response to the question whether Plaintiff would be able to manage her benefit funds, the assessor stated that "[s]he is able to manage simple financial things but not complex ones." (*Id.*)

A Request for Medical Advice completed on July 30, 2007, by Rom Kriauciunas, Ph.D., concluded that Plaintiff "appears capable of unskilled work." (Tr. at 563.) Dr. Kriauciunas also noted that Plaintiff had "never had psychiatric or mental health treatment," was "[a]utonomous in answering questions about herself," was "in contact with reality[,] . . . spontaneous, logical, and organized with normal speech," but was also "anxious, nervous," "frustrated," and "had a

constricted affect." (Tr. at 562.) He also noted "[p]oor abstract thinking" and "[p]oor judgment." (*Id*.)

A Mental Residual Functional Capacity ("RFC") Assessment completed on August 10, 2007, by Dr. Kriauciunas concluded that Plaintiff was "moderately limited" in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods, and to interact appropriately with the general public. (Tr. at 566-67.) She was also found to be moderately limited in her "ability to respond appropriately to changes in the work setting." (Tr. at 567.) She was found to be "not significantly limited" in understanding, memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. at 566-67.) Dr. Kriauciunas also concluded that Plaintiff was "able to do simple, low-stress, unskilled work on a sustained basis." (Tr. at 568.)

A Psychiatric Review Technique also completed by Dr. Kriauciunas on August 10, 2007, diagnosed organic mental disorders (cognitive disorder, NOS), anxiety-related disorders and personality disorders. (Tr. at 570, 571, 575, 577.) Dr. Kriauciunas opined that Plaintiff was mildly restricted in her activities of daily living, moderately limited in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. at 580.) It was also noted that there was insufficient evidence of medical dispositions to complete the Psychiatric Review Technique. (Tr. at 584.)

On January 14, 2008, an MRI of Plaintiff's lumbar spine showed "paracentral and right parasagittal focal disk protrusion at L4-L5 Level which comes in close association with the right L5 nerve root in the subforaminal zone region on the right," an "annular tear [on] the disk, right lateral aspect, at L3-L4 level," and "no significant central canal narrowing or neural foraminal narrowing identified at the remainder of the levels." (Tr. at 598-99, 607-08.)

On April 24, 2008, Kevin Bur, D.O., reviewed Plaintiff's MRI, examined her, and prescribed medication for back pain. (Tr. at 603.) Dr. Bur also indicated that Plaintiff could contact him if she had "any problems or would like to try an epidural steroid injection or right sacroiliac joint injection." (Tr. at 603.)

An MRI of Plaintiff's cervical spine taken on July 16, 2008, showed "[m]ultilevel degenerative changes" and "no abnormal cord signal identified at any level." (Tr. at 606.)

On July 30, 2008, Plaintiff underwent sacroiliac joint injection under fluoroscopy, right posterior shoulder bursa injection, and trigger point injections of the right cervical spine. (Tr. at 611-12.)

An MRI of the cervical spine taken on November 6, 2009, showed "redemonstration of multilevel degenerative changes in the cervical spine, and overall this appearance is stable." (Tr. at 678.) There was "at least [a] mild degree of central canal narrowing at C4-C5 and C5-C6, the worst two levels, but there [was] no direct cord impingement or abnormal cord signal identified" and there was "[m]ultilevel neural foraminal narrowing redemonstrated." (*Id.*)

In her daily activity report, Plaintiff stated that she was able to do laundry, mow the lawn and clean the house as needed. (Tr. at 142, 144.) Plaintiff also stated that she was able to prepare her own meals, walk, attend church, spend time with and talk on the phone with family, shop in stores "once a week" for "6-7 hours" and use public transportation, but that her driver's license was suspended so she was not driving at the time. (Tr. at 144-46.)

Plaintiff testified at the administrative hearing that she has constant pain in her neck and back, that she can sit for around 15 to 20 minutes before needing to stand, and that she can walk for about half a block before having to stop. (Tr. at 34-35.) Plaintiff stated that she is able to drive

but does not believe she can lift more than five pounds. (Tr. at 36.) Plaintiff also testified that she watches television most of the day and is able to dress and care for herself. (Tr. at 40.)

The ALJ asked the vocational expert ("VE") to consider a person with Plaintiff's background

> who would have the residual functional capacity for a range of sedentary, unskilled work, that would also require a sit/stand option at will, would not involve working around machinery or unprotected heights and would involve only occasional bending, twisting, turning, climbing, crawling, squatting and kneeling.

(Tr. at 45.) The VE responded that such a person could perform the 400 system monitor, 1,795 ticket checker, 1,735 assembly bench, 610 inspector bench, and 2,485 information clerk jobs available in the lower peninsula of Michigan. (*Id.*) The VE further testified that if Plaintiff's testimony that she needs to lie down three to four times per day for 25 to 45 minutes were factored in, Plaintiff would not be capable of full-time work. (Tr. at 45-46.)

### F.   Analysis and Conclusions

### 1.   Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, she possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 18-21.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of

14

an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. (Doc. 12.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that the ALJ's RFC finding that she was able to perform unskilled work failed to account for her moderate limitations in concentration, persistence and pace and, thus, requires a remand under sentence four. (Doc. 12 at 8-11.) In addition, Plaintiff seeks remand under sentence six due to new evidence, i.e., a decision of the Social Security Administration that Plaintiff is entitled to SSI benefits based on an application filed on December 21, 2010, finding that Plaintiff was disabled beginning in December 2010. (Doc. 12 at 11-12, Ex. A.)

### a.    Unskilled Work & Moderate Limitations in Concentration, Persistence & Pace

With regard to Plaintiff's contention that the ALJ's RFC finding that she was able to perform unskilled work failed to account for her moderate limitations in concentration, persistence

and pace and requires a remand under sentence four, this argument is "not uncommon and the case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No. 10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). The *Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace . . . . However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of, for example, "unskilled work" but excludes a moderate limitation in concentration. Rather this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's hypothetical and RFC assessment.

*Id.* at *10 (citations omitted).

In the instant case, Plaintiff relies on the mental RFC assessment and Psychiatric Review Technique completed by Dr. Kriauciunas. Although the doctor found that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain concentration for extended periods, and to interact appropriately with the general public, Dr. Kirauciunas also found that Plaintiff was not significantly limited in the ability to complete a normal workday or week without interruption from psychologically based symptoms and that she was not significantly limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 566-67.) In the Psychiatric Review Technique, Dr. Kriauciunas opined that Plaintiff is mildly restricted in her activities of daily living, is moderately limited in maintaining social functioning, and moderately limited in maintaining concentration, persistence, or pace. (Tr. at 580.) However, Dr. Kirauciunas also concluded in the mental RFC assessment that Plaintiff was "able to do simple, low-stress, unskilled work on a sustained basis" despite her limitations. (Tr. at 568.)

I therefore suggest that the record as a whole provides substantial evidence supporting the ALJ's hypothetical and the RFC assessment limiting Plaintiff to unskilled work. (Tr. at 18, 22, 45,

566-68.) *See Infantado v. Astrue*, 263 Fed. App'x 469, 477 (6th Cir. 2008) (substantial evidence supported ALJ's decision where, although the psychiatrist found "moderate" limitations in the plaintiff's ability to maintain attention and concentration for extended periods, the psychiatrist noted the plaintiff's daily activities and concluded that the plaintiff was capable of performing simple tasks on a sustained basis); *Cummings v. Comm'r of Soc. Sec.*, No. 10-11621, 2011 WL 3958473 (E.D. Mich. Sept. 8, 2011) (ALJ's omission of concentration and pace limitations in the hypothetical was reasonable where doctor who concluded the plaintiff had "serious concentration and attention difficulties" also found his "ability to work may not be severely impaired as long as the job does not involve any appreciable amount of contact with people"); *Lewicki v. Comm'r of Soc. Sec.*, No. 09-11844, 2010 WL 3905375, at *3 (E.D. Mich. Sep. 30, 2010) ("Plaintiff's objection ignores a particularly compelling piece of evidence[;] . . . the psychologist diagnosed moderate mental impairments but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work"). I therefore suggest that the ALJ's decision is supported by substantial evidence on this ground and should not be disturbed.

      **b.**    **Sentence Six Remand**

Plaintiff seeks remand under sentence six due to new evidence, i.e., a decision of the Social Security Administration that Plaintiff is entitled to SSI benefits based on an application filed on December 21, 2010, finding that Plaintiff was disabled beginning in December 2010. (Doc. 12 at 11-12, Ex. A.) Sentence six of 42 U.S.C. § 405(g) allows the district court to remand in light of additional evidence without making any substantive ruling as to the merits of the Commissioner's decision, but only if a claimant can show good cause for failing to present the evidence earlier. *Melkonyan v. Sullivan*, 501 U.S. 89, 100, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991). The Sixth Circuit has long recognized that a court may only remand disability benefits cases when a claimant

carries his burden to show that "the evidence is 'new' and 'material' and 'good cause' is shown for the failure to present the evidence to the ALJ." *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010). Evidence is only "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Id.* (citing *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)). In addition, "such evidence is 'material' only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Foster*, 279 F.3d at 357.

"'Good cause' is shown for a sentence six remand only 'if the new evidence arises from continued medical treatment of the condition, and was not generated merely for the purpose of attempting to prove disability.'" *Payne v. Comm'r of Soc. Sec.*, No. 1:09-cv-1159, 2011 WL 811422, at *12 (W.D. Mich. Feb. 11, 2010) (finding evidence generated after the hearing and submitted to the Appeals Council for the purpose of attempting to prove disability was not "new").

Plaintiff contends that "[g]ood cause exists for this evidence since it was not created until after the Unfavorable Decision was issued" and that it is "material in that it is evidence that the Social Security Administration considers Plaintiff to be medically disabled as of December 2010, the same month that she received her Appeals Council denial." (Doc. 12 at 12.)

However, the Sixth Circuit has held that a subsequent favorable decision does not constitute new and material evidence under section 405(g). *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646 (6th Cir. 2009). In so holding, the Sixth Circuit expressly noted several district court decisions which had "misapplied" the § 405(g) standard. *Id.* The Sixth Circuit reasoned that the "only way [a subsequent decision] might change the outcome of the initial proceeding is by the power of its alternative analysis of the same evidence [b]ut remand under sentence six is not meant to address the 'correctness of the administrative determination' made on the evidence already before the

ALJ." *Id.* (quoting *Melkonyan,* 501 U.S. at 100). "A sentence six remand would be appropriate based on [a plaintiff's] subsequent favorable decision only if the subsequent decision was supported by new and material evidence that [the plaintiff] had good cause for not raising in the prior proceeding." *Id.* However, where, as here, a plaintiff "does not argue that there is any new substantive evidence . . . but instead relies exclusively on the existence of the subsequent decision," the burden under section 405(g) is not met. *Id.* The Sixth Circuit also found that "[t]o the extent that [a plaintiff] argues that remand is appropriate based on the *possibility* of new and material evidence, this contradicts the clear language of § 405(g) that requires a '*showing* that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Id.* (emphasis in original).

Accordingly, I suggest that a remand under sentence six would be inappropriate and that Plaintiff's motion for summary judgment should be denied on this ground as well.

### 3.     Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d

590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.


s/ Charles E Binder
CHARLES E. BINDER
United States Magistrate Judge

Dated: March 12, 2012


**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  March 12, 2012            By      s/Patricia T. Morris
                                         Law Clerk to Magistrate Judge Binder